**THE ECOLOGY CENTER, INC., et al., Plaintiffs,**

v.

**Robert RUSSELL, et al., Defendants.**

**No. 2:03–CV–589 TS.**

United States District Court, D. Utah, Central Division.

March 23, 2005.

Center and The Aquarius Escalante Foundation (Plaintiffs). Plaintiffs seek review of a Record of Decision (ROD) issued by the Acting Forest Supervisor of the Dixie National Forest (the DNF), an agency of the United States Department of Agriculture. The decision in question is the final approval by the DNF of the Griffin Springs Resource Management Project, (the Project) in which the DNF approved a plan to allow logging in the Griffin Springs area of the DNF. Plaintiffs seek declaratory and injunctive relief to stop the implementation of the plan, claiming that the ROD violates the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedures Act (APA). The case comes before the Court on Defendants' Motion to Dismiss. In addition to the original Petition for Review and the memoranda supporting the Motion to Dismiss, the Court also considers arguments set forth in an *amicus* brief, submitted by the Utah Division of Forestry and several Utah counties. After the Court heard oral argument on this Motion, the Tenth Circuit case *Utah Environmental Congress v. Bosworth*, 372 F.3d 1219 (10th Cir.2004) was published. The Court gave counsel the opportunity to file supplemental briefs responding to the *Bosworth* decision.

Jeffrey E Nelson, Mr. U.S. Attorney's Office, Gail C. Orendorff, U.S. Dept of Justice Environment & Natural Resources Div., Washington, DC, for Gail Mayfield, Robert A. Russell, United States Forest Service.

Raymond Scott Berry, Law Office of Raymond Scott Berry, Salt Lake City, UT, Thomas J. Woodbury, Missoula, MT, for Ecology Center, Aquarius Escalante Foundation.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

STEWART, District Judge.

The instant case is a Petition for Review of Agency Action, brought by The Ecology

The Court reviews the agency decision under an arbitrary and capricious standard. This entails an inquiry by the Court as to whether the agency has "considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Penobscot Air Servs., Ltd. v. Federal Aviation Admin.*, 164 F.3d 713, 719 (1st Cir.1999)(internal quotations and citations omitted). Thus, if the Court finds that the agency's decision is supported by the facts in the

record, and is not contrary to law, the Court should affirm the agency's decision.

The Court's analysis of the instant motion is divided into three sections: a description of the Project, the objections raised by Plaintiffs to the Project and analysis of those objections, and a conclusion.

The Court will grant Defendants' Motion to Dismiss, for the reasons hereafter stated.

## I.   The Project

The Project is a vegetation management proposal that encompasses an area of 11,-835 acres of aspen and spruce/fir trees on the Aquarius Plateau of the DNF. The Forest Service (FS) believes that 3,651 acres within the Project exceed maximum levels of tree density, and 2,990 acres are approaching maximum levels of tree density. According to the FS, this density causes declines in tree growth and vigor. Further, much of the aspen growth is threatened by spruce and fir trees, which have thrown off the balance between the varieties of trees. The FS claims that the Project is designed to counter both of these trends by thinning certain areas of certain kinds and ages of trees.

The logging in the Project will consist of an initial phase of clearcut harvesting, involving 112 acres. The FS will then use prescribed fire to stimulate aspen growth. Finally, commercial loggers will apply thinning to timber across 3,307 acres.

## II.   The Objections Raised By Plaintiffs and the Court's Analyses Thereof

The legal framework governing this dispute is provided by NFMA and NEPA.

NFMA requires the FS to develop a "land and resource management plan" (Forest Plan) for each unit of the National Forest Service. The Forest Plan for the DNF was adopted in 1986. It provides, among other things, that seven to ten percent of each drainage in the forest should be maintained as old growth.[1]

Implementation of the Forest Plan occurs on a project-by-project basis. Only at the project level does the FS make a firm commitment of resources. Each project must be consistent with the Forest Plan and analyzed pursuant to NEPA.

NEPA is a procedural statute which requires federal agencies to make informed analyses of the environmental impacts of their actions. See 42 U.S.C. § 4332(2)(C). Specifically, when a federal agency proposes to undertake a "major Federal action significantly affecting the quality of the human environment," NEPA requires the agency to prepare an Environmental Impact Statement (EIS). Id. Prior to the approval of the Project, the FS undertook both an EIS and a Supplemental EIS (SEIS). The SEIS was required so that the FS could consider new information that was presented in a report entitled, *Life History and Analysis of Endangered, Threatened, Candidate, Sensitive and Management Indicator Species for the Dixie National Forest.* A substantial administrative record (AR) was created by the FS in preparing the EIS and the SEIS prior to the approval of the ROD.

The Plaintiffs' objections to the ROD for the Project are contained in *Plaintiffs' Petition For Review of Agency Action.* They will be taken up in the order that they

---

**1.**  Old growth is defined in many different ways, but each definition seems to have as a consistent requirement that the trees in such forest be at least 150 years old.

appear therein.[2]

## 1. The Forest Service Is Required By Law To Fully Disclose and Thoroughly Analyze All Potential Adverse Environmental Impacts of Timber Harvest

Plaintiffs make unsubstantiated assertions in this objection about the failure of the FS to "demonstrate consistency of the Griffin Springs Project with the DNF Forest Plan," the failure of the FS to take "a hard look at many critical issues" and they allege that "the FEIS for the Project is based on myriad expert conclusions that lack the kind of credible, hard quantitative data that is necessary to inform the public and the courts of the basis for these conclusions."

With no citation to the AR or any supporting argument, the Court is unable to discern what is being objected to and for what reason. The deference provided to the agency is substantial and the burden of proof is on the Plaintiffs to prove their objections are valid. *Park County Resource Council, Inc. v. U.S. Department of Agriculture*, 817 F.2d 609, 621 (10th Cir. 1987) *overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.) *cert. denied*, 506 U.S. 817, 113 S.Ct. 59, 121 L.Ed.2d 27 (1992). Plaintiffs have made no effort to carry their burden of proof on the specific claims made in this objection, except to the extent that the substance of these general objections are contained in the two objections discussed in sections two and three.

## 2. The FS Has Failed To Demonstrate Compliance of The Griffin Springs Project with the DNF Plan Old Growth Standard

As previously noted, the Forest Plan for the DNF calls for seven to ten percent of each drainage area to be managed as old growth forest. Plaintiffs first assert that such amount of old growth is inadequate, but do not seem to be challenging that aspect of the Forest Plan in this Petition. The Court would deem such a challenge to be misplaced.

### A. DNF Use of Properly Functioning Condition Assessments

■ Plaintiffs do take issue with the DNF's establishment of "properly functioning condition"(PFC) assessments as a basis for the DNF's forestry decisions. A PFC is a set of standards used by the DNF to define a healthy, operating section of forest. These standards are used to assess whether certain areas are functioning as well as possible. The DNF argues that because PFC assessments are merely methodological instruments, rather than final decisions of agency action, PFCs are not subject to NEPA procedure. Instead, PFCs contribute to collecting data for later use in NEPA decision-making.

Plaintiffs claim that the DNF used its PFCs (which it contends serve as a guide for logging decisions) to justify the conclusions of its final EIS. Because the PFCs have not passed through NEPA procedure, that allegation would mean that the DNF's SEIS and ROD are based on facts and conclusions that are not open to public

---

**2.** The Court notes that Plaintiffs' Petition is best described as "unfocused." The Court struggled to ascertain what part of the Petition was intended to be background, what was simple observation, what was general criticism of the Project, and what were the

substantive objections to the ROD. Based upon Plaintiff's various filings and the oral argument that was conducted in this case, the Court has done its best to discern the wheat from the chaff.

discussion under NEPA. In other words, Plaintiffs accuse the DNF of using PFCs to justify decisions that ought to be based on more in-depth studies that are open to public comment. Plaintiffs argue that because the PFCs are not NEPA documents, their use in the Project decision foreclosed public comment, thereby violating NEPA.

To resolve this question the Court must determine whether the use of PFCs is appropriate under NEPA. For two reasons, the Court finds that the DNF"s methodology was appropriate. First, the DNF argues, and Plaintiffs do not refute the point that PFCs do not make any commitment of resources to a project, nor do they, by themselves, have an environmental impact. This is borne out by the Plaintiffs' admission that "... it is the establishment of PFCs itself ... which creates the potential for significant adverse environmental impact ..." Plaintiffs' Memorandum Petition at 6. This sentence suggests that Plaintiffs themselves are unable to assert that PFCs actually constitute decisions that will have an impact; only that they create *potential* for impact. If the Court were to adopt Plaintiffs' reasoning, any analytical or scientific assessment undertaken by the DNF would need to be conducted under the rigors of NEPA, since these, too, could create potential for an environmental impact.

Second, Plaintiffs are unable to cite any authority to suggest that the PFCs are improper under NEPA. The single case cited to support their argument, *Kern v. Bureau of Land Management,* 284 F.3d 1062, 1073 (9th Cir.2002) stands for the proposition that an EIS cannot be "tiered" (adopted by reference) to standards that have not run the NEPA gauntlet. In this instance the FS has only relied upon the PFCs to supplement the Desired Future Condition established by the FP. The PFCs are not tiered to the EIS or the SEIS in this case.

■ NEPA does not require that all analytical tools used by the DNF be processed according to its standards— only those decisions which will significantly impact the human environment. Because Plaintiffs have not made a persuasive case that PFCs have a significant impact on the environment, their objection to the DNF"s use of PFCs is not a ground for this Court to grant Plaintiffs' Petition.

## B. Old Growth Measurements

The second objection to the Project decision is that the DNF failed to consider detailed data of old growth areas. Citing NEPA's requirement that an agency release detailed information that was used in reaching its decisions, Plaintiffs argue that the DNF has failed to produce hard data by which its claims could be substantiated. One example of the alleged deficiency of information is in the DNF"s assessment of the amount of old growth trees in the Project area. While the DNF claimed to have assessed the Project area for old growth according to definitions of old growth provided by *Characteristics of Old Growth Forests in the Intermountain Region* (Hamilton, 1993), Plaintiffs argue that there is no evidence that the DNF has actually surveyed the forest based on the Hamilton definition. Without the hard data supporting the DNF"s assertion, Plaintiffs argue that the DNF"s old growth numbers cannot be relied upon.

The DNF offers many instances in the record in which hard data supporting its assessment of old growth were disclosed. Defendants offer multiple citations to the record, all of which lead to voluminous

amounts of hard data concerning the varieties, distributions, and vigor of the growth numbers in the Project area. *See* AR Vol 16 at 11670; AR Vol 17 at 12888; AR Vol 18 at 13830; AR Vol 19 at 14725; *and* AR Vol 20 at 15800.

■ Given that the hard data obviously exist, it is clear to the Court that Plaintiffs' dispute is not about the existence of hard data, but the existence of the kind of data Plaintiffs consider to be most helpful. The Court does not sit in this case to decide such matters. Under the arbitrary and capricious standard, the Court must "merely examine 'whether there is a reasonable, good faith, objective presentation of' the topics [NEPA] requires..." *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1522 (10th Cir.1992)(quoting *Johnston v. Davis,* 698 F.2d 1088, 1091 (10th Cir.1983)). As long as it is clear that the DNF has taken a "hard look" at the facts and implications surrounding its decision, the standard of review is satisfied. *Id.* The Court is satisfied that the FS analysis in this respect is reasonable, which is all that is required.

A related point of contention concerns Plaintiffs' deductive conclusion that the DNF has failed to correctly tally the actual acreage of existing old growth. The reasoning is as follows: the DNF admits that there were beetle epidemics in the 1920's and 1930's that destroyed up to 90 percent of old growth. In later years, 595 acres of the area in the Project were clearcut, and 5,627 acres were partially cut. Plaintiffs contend that, given this devastation, it is unlikely that any substantial portion of old growth could still exist.

However, the DNF flatly denies the logic of Plaintiffs' argument. Although conceding that the beetle epidemic wiped out 90% of the spruce in the Dixie National Forest as a whole, the DNF asserts that the greater part of the damage was done to the sections not included within the Project area. Thus, today there remain 3,752 acres of old growth within the Project area, which comprises 32% of the forested area.

In balancing the strengths of these opposing viewpoints, the Court gives greater weight to real data than to logical deductions. In other words, Plaintiffs' case for the incorrectness of the DNF's old growth numbers is based on inferences drawn out over several logical steps from a few authoritative statistics. Given the weight of the arbitrary and capricious standard, there is little reason to credit the Plaintiffs' deductions and assumptions, especially in the face of real numbers provided by the DNF.

**3. The FS Has Failed To Insure the Viability of Sensitive Old Growth Species in the DNF, As Evidenced By the Project FEIS.**

**A. Flammulated Owl**

Plaintiffs challenge the absence of a conservation strategy for the flammulated owl, a sensitive species. Defendants assert, and Plaintiffs do not rebut, that a conservation strategy is only required for those sensitive species that may be negatively affected by a forest plan or a proposed project. Plaintiffs offer no evidence that the owl is being put at risk by either the Forest Plan for the DNF or by the Project itself.

Plaintiffs also take issue with the fact that the FEIS addresses the foraging needs of the owl, but does not adequately address the impacts on the nesting and roosting habitat for the owl. Defendants assert, to the contrary, that the AR shows

that one of the purposes of the Project is to *increase* owl nesting habitat through the proposed spruce/fir treatment. Further, the AR shows that the Project will increase canopies and prey populations for the owl.

The Court concludes that the unrebutted evidence is that the Project will benefit the flammulated owl.

### B. Failure of the FS To Rely on *Reynolds* and Similar Miscellaneous Criticism

Plaintiffs allege a number of failings in the DNF's approach to the ROD. They include failure to strictly comply with the *Management Recommendations for the Northern Goshawk in the Southwestern United States,* (Reynolds et. al., 1992), failure to maintain 20% old growth habitat for the northern goshawk, failure to thin from below, failure to allow some decadence among the forest trees, etc. These observations and objections are made without justifying evidence.

■ Without attempting to ascertain whether each of these is intended to be an objection to the ROD, the Court will only note that the FS has addressed each of Plaintiffs' concerns with reference to either the AR or other justifications for the standards relied upon or the decisions made by the FS. A court is to avoid second-guessing the decisions made by an administrative body absent evidence demonstrating that it is "significantly inaccurate." *Natural Resources Defense Council v. Hodel,* 865 F.2d 288, 309 (D.C.Cir. 1985). The Plaintiffs have simply not met their burden in reference to these comments, and the Court will not rely upon them to reverse the decision to proceed with the Project.

### C. Failure To Conduct Adequate Population Studies

Based upon the totality of the record before the Court, including the oral argument, and the supplemental briefing, the Court concludes that the Plaintiffs' primary objection to the ROD is the alleged failure of the FS to conduct adequate studies of the population of the northern goshawk. Plaintiffs assert at page 21 of their Petition, "[n]owhere in the Griffin Springs FEIS is there any reference to the monitoring requirements for the Goshawk Plan Amendments.... Absent baseline monitoring of goshawk occupancy at the forest and project levels it is not possible for the public to gauge for itself the impacts of this proposed project on old growth species." Thus, Plaintiffs seek baseline monitoring of the goshawk at both the levels of the DNF and the Project.

Both Plaintiffs and Defendants addressed the issue of the necessity for such population studies in considerable depth in the original round of briefings in this case and before the Court in oral argument. Much of what was there argued was made moot by the decision of the Tenth Circuit in *Utah Environmental Congress v. Bosworth,* 372 F.3d 1219 (10th Cir.2004). The central question of whether the FS is required under NFMA to collect quantitative population data on Management Indicator Species (MIS), instead of relying on habitat data alone, is now settled. The *Bosworth* panel held unequivocally that any reading of the regulation in question, 36 C.F.R. § 219.19, that suggests that only habitat analysis is required would be "inconsistent with the regulation's plain meaning." *Id.* at 1227 (quoting *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993)). Far from requiring only habitat analysis, the Tenth Circuit held that "in

order to effectuate its MIS monitoring duties under the language of its regulations, the FS must gather quantitative data on actual MIS populations that allow it to estimate the effects of any forest management activities on the animal population trends, and determine the relationship between management activities and population trend changes." *Id.* (footnote omitted).

 The AR in this case indicates that there are no nesting goshawks within the Project area. AR Vol 28 at 22911. The Court's reading of *Bosworth* indicates that the FS must therefore establish that it is conducting adequate monitoring of the MIS outside of the Project area.

In 1998, the FS and other agencies of the federal and state governments adopted the Northern Goshawk Conservation Strategy. This strategy sets forth, among other things, monitoring requirements for the Goshawk. Statewide in Utah, the Conservation Strategy calls for the random sampling of at least 20 territories annually. The Forest Plan monitoring requirements are set out in the AR Vol 12 at 8453. The DNF has approximately 96 territories within the DNF (AR 19305), all of which are monitored. (AR Vol 23 at 8295–18328, 18418–18592, 18593–18668, 18669–18720, 18779–18791). Thus, the DNF has met or exceeded the monitoring requirements set forth in the Conservation Strategy. Further, the AR is supplied (see Memorandum in Support of Federal Defendants' Opposition and Motion to Dismiss Plaintiffs' Petition For Review of Agency Action, at 23) referencing all of the DNF's efforts to monitor goshawk population trends.

The Court is convinced that the DNF has met the requirements for population monitoring of the northern goshawk required by *Bosworth,* supra.

### III. Conclusion

The Court finds that the Plaintiffs' Petition For Review of Agency Action is without merit. The Court, therefore, grants Defendants' Motion to Dismiss.

The Clerk of Court is directed to close this case forthwith.

SO ORDERED.