**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 20, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PAUL DOBBS,

      Plaintiff - Appellant,

v.

UNITED STATES FOREST SERVICE;
NORMAN WAGONER, in his official
capacity as Forest Supervisor of Ouachita
National Forest; TONY TOOKE, in his
official capacity as Southern Regional
Forester for the United States Forest
Service; THOMAS TIDWELL, in his
official capacity as Chief of the United
States Forest Service,

      Defendants - Appellees.

No. 18-7007
(D.C. No. 6:16-CV-00112-RAW)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **MURPHY**, and **EID**, Circuit Judges.
_____

Paul Dobbs owns land that is completely surrounded by the Upper Kiamichi

River Wilderness in the Ouachita National Forest in Oklahoma. Desiring to build a

road to access his inholding, he applied to the United States Forest Service for a

special use permit to build a permanent gravel road through the wilderness area. The

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Forest Service[1] denied his request, and the district court upheld that decision. We affirm.

## I.

We first provide a general overview of the federal statutory and regulatory framework for the Forest Service's decision, then discuss the facts and procedural background of this case before proceeding to our analysis of the issues raised on appeal.

## A.

The Wilderness Act of 1964, Pub. L. No. 88–577, 78 Stat. 890 (codified at 16 U.S.C. §§ 1131–36), "established a National Wilderness Preservation System to be composed of federally owned areas designated by Congress as 'wilderness areas,'" 16 U.S.C. § 1131(a). Under the Act, wilderness areas are to "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness." *Id.* A wilderness is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," and as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions." *Id.* § 1131(c).

---

[1] Throughout this decision, the term "Forest Service" includes the individual defendants in this case.

Disposition of this appeal depends heavily on what constitutes "adequate access" to Dobbs's property. The Wilderness Act allows for "adequate access" to privately owned lands within designated wilderness areas:

> In any case where . . . privately owned land is completely surrounded by national forest lands within areas designated by this chapter as wilderness, such . . . private owner shall be given such rights as may be necessary to assure *adequate access* to such . . . privately owned land by such . . . private owner and their successors in interest . . . ."

*Id.* § 1134(a) (emphasis added);[2] *Id.* at § 3210(a) (directing the Secretary of Agriculture to provide access to non-federally owned land within the boundaries of the National Forest System "as the Secretary deems *adequate* to secure to the owner the reasonable use and enjoyment thereof" (emphasis added)). However, permanent roads, motorized vehicles, and motorized equipment are generally prohibited in wilderness areas "[e]xcept as specifically provided for in [the Wilderness Act], and subject to existing private rights." *Id.* § 1133(c).

The Forest Service regulations define "adequate access" as "a route and method of access to non-Federal land that provides for reasonable use and enjoyment

---

[2] The second half of § 1134(a) sets up an alternative to providing adequate access: "or the . . . privately owned land shall be exchanged for federally owned land in the same State of approximately equal value under authorities available to the Secretary of Agriculture." 16 U.S.C. § 1134(a). In its supplemental brief, the Forest Service asks us to read this provision as providing "that a landowner has a right of access *or* exchange. If he is offered either, he has been accorded all the rights granted by the statute." Aple. Suppl. Br. at 12 (emphasis in original) (quoting *Rights-of-Way Across National Forests*, 4A Op. O.L.C. 30, 50). Thus, the Forest Service contends that because it offered Dobbs a land exchange, Dobbs now has "no right of access under § [1134(a)]." *Id.* (same). Because we affirm the lower court's judgment on other grounds, we do not consider this argument.

3

of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources." 36 C.F.R. § 251.111. When authorizing access to private lands over federal lands, the Forest Service must consider the following factors:

> (1) The use of means of ingress and egress which have been or are being customarily used with respect to similarly situated non-Federal land used for similar purposes; (2) The combination of routes and modes of travel, including nonmotorized modes, which will cause the least lasting impact on the wilderness but, at the same time, will permit the reasonable use of the non-federally owned land; (3) The examination of a voluntary acquisition of land or interests in land by exchange, purchase, or donation to modify or eliminate the need to use wilderness areas for access purposes.

*Id.* § 251.114(g)(1)–(3). In making this assessment, the authorized officer must, among other things, "ensure that . . . [t]he route is so located and constructed as to minimize adverse impacts on soils, fish and wildlife, scenic, cultural, threatened and endangered species, and other values of the Federal land." *Id.* § 251.114(f)(2).

B.

Pursuant to the Wilderness Act, Congress established the 9,371-acre Upper Kiamichi River Wilderness (Upper Kiamichi Wilderness) in 1988 and directed that its administration was "[s]ubject to valid existing rights." 16 U.S.C. §§ 460vv-1(2), 460vv-3. In 2006, Dobbs purchased a 160-acre parcel wholly surrounded by the Upper Kiamichi Wilderness. The property lies approximately one-half mile south of the Talimena Scenic Drive, which runs along, but outside of, the Upper Kiamichi Wilderness's northern border, and three miles east of Oklahoma State Highway 259. Dobbs purchased the property intending to, among other things, build a cabin. At the

4

time he purchased the property, the only access to it was by walking cross-country or on the remnants of an unmaintained foot trail. In 2007, Dobbs applied for a special-use authorization to construct a permanent, private, graveled road beginning on the Talimena Scenic Drive. Because a direct, half-mile route would require a steep descent and ascent, he proposed a longer route of just over one mile that reduced the grade.[3]

In 2012, the Forest Service completed an environmental assessment (First EA) that examined the proposed road and two alternatives: Alternative A was taking no action, and Alternative B was constructing a road with a porous paving surface. Based on the First EA and a biological assessment, the Regional Forester denied Dobbs's application by issuing a decision implementing the no-action alternative (First Decision). Dobbs appealed the First Decision to the Chief of the Forest Service. In response, the Regional Forester withdrew the First Decision and issued an amended environmental assessment (Amended EA) that included a new, fourth option—Alternative C—that provided for the construction of a natural-surface, non-motorized trail along the same route as the road Dobbs proposed. *See* 1 AR at 9–49.[4]

---

[3] The parties unsuccessfully discussed the Forest Service acquiring Dobbs's property by purchase or exchange for a parcel outside of designated wilderness.

[4] The Administrative Record is found in Supplemental Record Vol. 1, which consists of eleven parts. For convenience, our citations to the Administrative Record will designate the part number followed by "AR" and then the page number(s). For example, "1 AR at 15" means "Supplemental R., Vol. 1, Admin. R., Pt. 1 at 15."

The Amended EA assessed factors necessary in determining whether a road was required to give Dobbs adequate access to his property. In examining the customary means of ingress and egress for similarly situated land used for similar purposes, the Amended EA noted that the term "similarly situated" referred to "private inholdings within [the] wilderness," and that the term "similar purposes" referred to "residential use." AR at 25. It reported that Robert Morrison—an inholder of a nearby private tract which contained a cabin—was granted a special use permit in 1997 to maintain and use a road that existed before the Upper Kiamichi Wilderness was established. *See id* at 26.

But no permits, according to the Amended EA, had ever been granted to construct a *new* road within any wilderness in the Ouachita National Forest. *Id*. This trend, it noted, was consistent with practices nationwide because a review of National Forests found that "motorized vehicles were only allowed on roads that existed prior to the area's wilderness designation." *Id*. That same national review found "no cases of new road construction . . . except in the rare instance where a new road was authorized by wilderness legislation." *Id*.

The Amended EA examined the dimensions and clearance requirements for Dobbs's proposed road and the other potential alternatives. The road, it found, "would be approximately 5,300 feet long across National Forest System Lands with a 10-12 foot running surface," and "[c]learing limits for construction would average 40 feet," but where "slopes exceed 20 percent the clearing width would extend up to 100 feet."

6

*Id.* at 18.[5]  "The total area directly affected by the proposed road would be approximately 5 acres."  *Id.*  Construction would entail "heavy equipment, including one or more bulldozers, dump trucks, and either a 'hammer-hoe' (a very large jack hammer mounted on a trackhoe) or explosives to dislodge areas of solid sandstone ledge and bedrock along the proposed route."  *Id.* at 19.  Construction would release 41.5 tons of sediment.  *Id.* at 22.  In contrast, Alternative C's non-motorized trail would have a "maintained tread width" of "1–2 feet," with a "maximum clearing width" of 3 to 5 feet.  *Id.* at 20.  It would dislodge an unspecified, but lesser, amount of sediment.  *Id.* at 22.

The Amended EA then discussed how the above construction requirements would impact the four qualities of wilderness character: (1) untrammeled, (2) natural, (3) undeveloped, and (4) solitude or primitive and unconfined recreation.  It found that both the proposed road and Alternative B would have a moderate impact on (1) and (2), and a high impact on (3) and (4).  *Id.* at 29–32.  Alternative C would have a minor impact on these four qualities, and the no-action alternative would have no impact on them.  *Id.* at 31–33.

The assessment also examined the factors set out in 36 C.F.R. § 251.114(f)(2): whether the proposed "route is so located and constructed as to minimize adverse impacts on soils, fish and wildlife, scenic, cultural, threatened and endangered

---

[5] The Regional Forester found that a road with a porous paving surface—Alternative B—would require essentially the same construction methods and have the same impacts as a gravel road, so we omit this alternative from our discussion.

species, and other values of the Federal land." It reported that the proposed road and Alternative B would (1) have a moderate impact on scenic quality; (2) have a low impact on the risk to aquatic beneficial uses; (3) not be likely to adversely affect proposed, endangered, threatened, and sensitive species, but could impact sensitive species; and (4) have no impact on management indicator species or cultural resources. 1 AR at 22. By contrast, Alternative C's non-motorized trail and the no-action alternative would have minor or no impacts on these characteristics except for some possible impact on sensitive species. *Id.*

Regarding the impact on scenic quality, the Amended EA elaborated that there was a "high" degree of public importance placed on the views of the wilderness as can be observed from the Talimena Scenic Drive. *Id.* at 33. With that said, the report noted that Dobbs's proposed road would impact these "views of the wilderness" in the following ways: (1) there could be "considerable downslope movement of dislodged materials" that would "introduc[e] anthropogenic changes to the wilderness well outside the clearing limits for the road itself"; (2) tree removal "would obviously change the character of [the] vegetation and introduce another visual (as seen by a cross-country hiker or hunter) and ecological impact on wilderness character"; (3) "[t]he intersection of the proposed road with the Talimena Scenic Drive would be clearly visible to auto tourists"; (4) the "road would contrast with the existing landscape character"; and (5) approximately one-half mile of the road would be visible from "Chaha Vista, a developed vehicle pull-off/scenic overlook located west of the proposed road location." *Id.* at 34.

8

The Amended EA articulated the overall effects and benefits of the proposed road and the three alternatives. It found that the proposed gravel road and Alternative B (the road with a porous paving surface) "may enhance the use and enjoyment of the private land" but would "result in permanent and irretrievable loss in wilderness character." *Id.* at 27. It also concluded that "[a]llowing new road construction through a designated wilderness would be contrary to the agency's customary interpretation and application of the laws and regulations pertaining to access and wilderness management." *Id.* Separately, the report noted that Alternative A (the no action alternative) would preserve the wilderness character and still allow Dobbs reasonable access to his property by using pack animals or helicopters to transport building materials. *Id.* at 27–28. Last, the Amended EA found that Alternative C (the non-motorized trail) would have "minor effects on wilderness character" while also allowing Dobbs reasonable access to his property. *Id.* at 28.

Based on the Amended EA, the Regional Forester issued a Decision Notice and Finding of No Significant Impact in 2013 (Final Decision), which is the subject of this appeal. *See id.* at 76–83. Like the First Decision, the Final Decision implemented the no-action alternative. The Regional Forester based her decision on the following reasons: (1) historic and traditional access to Dobbs's inholding was by foot trail or cross country, not by road; (2) none of the other private inholdings[6] in the Upper Kiamichi Wilderness

_____

[6] When comparing Dobbs's access to that of other inholders in her decision, the Regional Forester interpreted the term "similarly situated" more narrowly than did the Amended EA. She interpreted the term to mean "private inholdings within wilderness on the Ouachita National Forest without an existing private right to

9

or other wilderness areas in the Ouachita National Forest has had roads constructed in them since wilderness designation; (3) only one inholding in the Upper Kiamichi Wilderness has a permit for motorized access, but that access existed prior to the wilderness designation; (4) "[c]onstruction, maintenance[,] and use of the proposed road . . . would result in lasting adverse effects on wilderness character"; (5) Alternative C's non-motorized trail would not meet Dobbs's "expressed desire to have motorized access"[7]; and (6) "[n]on-motorized modes of access" would continue to give Dobbs "adequate access consistent with reasonable use and enjoyment of his property." *Id.* at 78-80.

The Regional Forester also discussed three other alternatives that were considered in the Amended EA but eliminated from detailed study: access by historic routes, access along abutting section lines, and access by new road construction from a southern approach. *See id.* at 80. The possible historic route was deemed impassable and, in any event, it never extended to or provided access for Dobbs's property. *See id.*[8] Section-line access was eliminated because it coursed very steep terrain, road construction would not minimize adverse environmental impacts, and

motorized access," *id*. at 77, whereas the Amended EA interpreted the term to mean all private inholdings within the wilderness. *Id*. at 25.

[7] While the Regional Forester rejected this alternative because it did not satisfy Dobbs's "expressed desire" to have motorized access to his property, she asserted that her decision did not preclude Dobbs from applying for a special use permit to build the non-motorized trail examined under Alternative C. 1 AR at 78.

[8] This conclusion was supported by a field review conducted by the Ouachita Recreation Program Manager, who investigated a potential historic route and found "no evidence of a road or [other] man-made features." 1 AR at 398.

Dobbs had not requested access along a section line. *See id.* And the southern route was eliminated because of very steep terrain and because it would cross a hiking trail, thereby creating safety issues and user conflicts. *See id.*

Dobbs appealed to the Chief Forester, who affirmed the Final Decision. *See id.* at 137–41. Dobbs then sought judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. The district court upheld the Final Decision, concluding that it was supported by substantial evidence and not arbitrary, capricious, an abuse of discretion, or contrary to law.

Dobbs now appeals to this court to vacate the district court's judgment and order the Forest Service to grant him a special use permit to build his proposed road. He claims that two of the agency's key findings—that Dobbs would have "adequate access" to his property even without motorized access to it, and that he did not have a preexisting right to build his proposed road—were arbitrary and capricious.

II.

We review the district court's decision de novo and the Forest Service's Final Decision pursuant to the APA. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227–28 (10th Cir. 2011). Under the APA, we will not set aside the Final Decision unless, as relevant here, we find that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under the arbitrary and capricious standard, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *IMC Kalium Carlsbad Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir. 2000)

11

(internal quotation marks omitted). The 'arbitrary or capricious' standard also requires an agency's action to be supported by . . . substantial evidence." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (internal quotation marks omitted).

"The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002). "Although our inquiry must be thorough, the Forest Service's decision is entitled to a presumption of regularity." *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (internal quotation marks omitted). "This deference is especially strong where the challenged decision involves technical or scientific matters within the [Forest Service's] area of expertise." *Id.* (brackets and internal quotation marks omitted).

Because Dobbs was represented by counsel before the district court but is pro se on appeal, we afford a liberal construction to only his appellate filings. *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994). We may not, however, act as his advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

III.

We conclude that Dobbs fails to show how the agency's actions—holding that Dobbs already had "adequate access" to his property, and that he lacked a preexisting right to build a road—were arbitrary or capricious.

A.

12

The agency's finding that Dobbs would still have "adequate access" to his property—even without a road—was neither arbitrary nor capricious because it "considered all relevant factors and . . . [was not] a clear error of judgment." *IMC Kalium Carlsbad*, 206 F.3d at 1012 (internal quotation marks omitted). The Wilderness Act of 1964 established that where private land is surrounded by national forest designated as "wilderness", the "private owner shall be given such rights as may be necessary to assure *adequate access*" to the private land. 16 U.S.C. § 1134(a) (emphasis added). The Forest Service regulations define "adequate access" as that which provides "reasonable use and enjoyment" of the land "consistent with similarly-situated non-Federal land and that minimize[s] damages or disturbance" to the national forest. 36 C.F.R. § 251.111.

The agency's "adequate access" finding considered all relevant factors, which are those detailed in Section 251 of the pertinent regulations. These regulations establish that, in determining what constitutes "adequate access," the agency must consider how similarly situated lands are customarily accessed, how to minimize the lasting impact to the wilderness, how to permit reasonable use of the land, and whether the inholding can be exchanged for other lands in an effort to "eliminate the need to use wilderness areas for access purposes." *See* 36 C.F.R. § 251.114(g). Here, the Forest Service concluded that non-vehicle access was consistent with how other inholders accessed similarly situated properties in the area, and that constructing a road would "result in lasting

13

adverse[9] effects on [the] wilderness character." *Id.* at 78.  Further, the Forest Service acknowledged that it attempted, in good faith, to exchange more accessible land with Dobbs's tract, but that such attempts were unsuccessful.  As such, we conclude that the Forest Service considered all relevant factors in its decision.

Additionally, Dobbs cannot show that the agency's decision constituted a "clear error of judgment."  Dobbs implies that the type of access that he currently enjoys—via cross-country or unimproved trail—cannot possibly be considered "adequate."  But with or without a road or cabin, Dobbs can use his property to the same extent that most of the other inholders in the area use their own inholdings.  We say this because the record does not clearly indicate that any inholding—other than Morrison's—contains a cabin or enjoys authorized roaded access.  1 AR at 3.[10]  And if Dobbs eventually decides to build

---

[9] Dobbs claims that the agency's "adverse effects" finding lacked substantial evidence.  We disagree.  He argues that the Forest Service found little to no adverse impact in four of the six categories considered, and that any adverse impact to scenic and wilderness quality would be no worse than that rendered by any other road in the wilderness.  But we think that the Regional Forester's findings regarding scenic quality and wilderness character were tailored to the particular road Dobbs proposed. The particular road—unlike others—would be clearly visible from the Chaha Vista lookout point and Talimena Scenic Drive, from which undisturbed views of the wilderness have a high degree of public importance.  Additionally, regarding damage to the forest, we think that the Amended EA adequately showed how the road would impact each characteristic of wilderness character.  Regardless, Dobbs cites no authority, nor are we aware of any, for his proposition that the Regional Forester was required to compare the impact of his road with the impacts of the Morrison Road, which is the only other road in the Upper Kiamichi Wilderness that is permitted for maintenance and use.

[10] Inversely, if one of those inholdings did contain a cabin, then Dobbs would have even less of an argument as to why he needs a road.  If an inholding had a cabin but lacked roaded access, then Dobbs could presumably also enjoy the use of a cabin without needing a road.

14

a cabin, the agency concluded that he can do so with pack animals and helicopter to transport materials. Given that this is a "technical . . . matter[] within the [Forest Service's] area of expertise," we owe their decision "especially strong" deference. *Utah Envtl. Cong.*, 483 F.3d at 1134 (internal quotation marks omitted).

Dobbs also contends that the agency failed to consider whether his proposed land use was reasonable, and that therefore the agency's ultimate findings were arbitrary and capricious. But the agency acknowledged[11] that Dobbs desired to "build a residence" on the land and found that he could do so without a road or improved trail by using pack animals or a helicopter to transport materials.[12] The agency therefore implied that building a cabin on the property was reasonable. Indeed, of all the reasons that the agency provided for denying Dobbs's permit, none of them suggested that the agency thought that Dobbs's proposed use was unreasonable. The agency instead based its denial on how other similarly-situated properties were accessed, and on the potential adverse impacts of Dobbs's proposed road.

---

[11] The underlying assumption in the Amended EA was that Dobbs would use his property for residential purposes. 1 AR at 25.

[12] In his reply brief, Dobbs argues that the Forest Service acted arbitrarily, capriciously, and beyond the scope of its authority in rejecting Alternative C because his lack of interest in a non-motorized trail is not among the regulatory factors provided for making a decision. But this legal argument was not in Dobbs's opening brief. Accordingly, we conclude Dobbs has waived it. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief."). Further, the Forest Service explicitly noted that nothing in its decision precluded Dobbs from specifically applying for a permit to build an improved trail in the future.

Separately, Dobbs argues that the agency wrongly interpreted the term "similarly situated properties." The Forest Service interpreted the term to include all properties without a pre-existing right to vehicular access, while Dobbs contends that the term should include all private tracts regardless of whether such tracts were historically accessed via road. Dobbs's proposed interpretation would suggest that his land was similarly situated with Robert Morrison's tract, which according to the record is the only tract in the wilderness that can be accessed via road.

We do not think that the agency's decision to exclude Morrison's tract from its definition of "similarly situated properties" was a clear error of judgment. The road on Morrison's tract existed before the Upper Kiamichi Wilderness was created, so its original construction did not disturb the national forest after it became protected. We therefore find that the Forest Service's decision to distinguish Dobbs's tract from Morrison's—which had an existing right to vehicular access—was reasonable. The agency's concern with "existing" rights is further supported by the emphasis put on such rights in the Wilderness Act and the Upper Kiamichi Wilderness Act of 1988. 16 U.S.C. § 1133(c) (prohibiting "permanent road[s]," "motor vehicles," and "motorized equipment" in wilderness areas "subject to *existing* private rights") (emphasis added); § 460vv-3 (asserting that administration of wilderness area was "[s]ubject to valid *existing* rights") (emphasis added).

Neither do we think that the agency's definition of "similarly situated properties" involves circular reasoning that would make it impossible for any inholder to obtain a permit to construct a new road in the area. Dobbs contends that the agency's

16

interpretation of the term would categorically disqualify all new roads from being constructed, and that therefore he should be refunded his application fee because seeking a special-use permit was futile. But we do not think that the agency would categorically preclude any new road from being built simply because no roads had ever been built in the area after the forest became protected by statute. Assessing the reasonable use of a property based on "similarly situated properties" is but one of several factors that the agency must consider when deciding to grant a special-use permit. Another important factor it must consider is to what extent construction would damage the surrounding wilderness. *See* 36 C.F.R. § 251.114(g). With that said, the agency here based its denial partially on the reason that Dobbs's proposed road would have resulted in lasting adverse effects to the forest. We therefore think it possible that the agency might have granted Dobbs a permit if the potential effects of construction were less significant. Dobbs's application was thus not futile, and he accordingly must pay his application costs as required by 36 C.F.R. § 251.58.

B.

The agency's finding that Dobbs lacked a preexisting right to have motorized-access to his land was similarly neither arbitrary nor capricious. Dobbs cannot show that his land could formerly be accessed via private road, nor does he identify a statute or title conferring such a right onto him. By his own admission, the only way Dobbs can currently access his property is via an unimproved trail or cross-country. Nonetheless, he contends that a manmade rock feature roughly 200 feet outside of the southeast corner of his tract shows that there used to be motorized access to this portion of his property.

17

However, the Ouachita Recreation Program Manager investigated this rock feature and the surrounding area and found "no evidence of a road or [other] man-made features." 1 AR at 398. And this finding is entitled to great deference because it "involves technical or scientific matters within the [Forest Service's] area of expertise." *Richmond*, 483 F.3d at 1134 (brackets and internal quotation marks omitted).

Dobbs separately argues that two section line statutes confer upon him a preexisting right to access his land via a private road. But this argument is unavailing because the two section line statutes that he relies on simply do not pertain to his proposed road. The statutes assert that in the Choctaw, Chickasaw, and Seminole nations, public highways "may be established on all section lines," Act of April 26, 1906, ch. 1876, § 24, 34 Stat. 145, and that private landowners can petition the Oklahoma Department of Transportation to declare section lines abutting their land as "public highways." Okla. Stat. tit. 69, § 1201. They thus pertain to public highways along section lines dividing separate plots of land, and by contrast do not concern *private* roads running *through* national forests. The section line statutes therefore do not confer Dobbs with a right to construct his specific requested road, which is a *private* road running *through* (and not along the section line of) a national forest. Further, there is no evidence that the section lines were ever actually used or that Dobbs ever pursued the necessary steps for securing a legal right to access them. *See* Okla. Stat. tit. 69, § 1201(A) (establishing process for securing access to section lines).

Overall, Dobbs does not identify a procedural or substantive error substantial enough to overcome the deference we owe the agency under the arbitrary and capricious standard of review.

IV.

For the foregoing reasons, we AFFIRM the district court's judgment.


Entered for the Court


Allison H. Eid
Circuit Judge