**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| WELDON LACKEY, | |
| Plaintiff-Appellant, | |
| v. | No. 08-2117 |
| | (D. N.M.) |
| UNITED STATES DEPARTMENT OF AGRICULTURE; MIKE JOHANNS, in his official capacity as Secretary of the United States Department of Agriculture, | (D.C. No. 1:07-CV-00842-JCH-RLP ) |
| Defendants-Appellees. | |

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

Weldon Lackey seeks sanctions, authorized by 7 C.F.R. § 400.768(e) in

appropriate cases, for what he claims was the United States Department of Agriculture's

(USDA) failure to timely provide a final agency determination (FAD) in response to his

request for an interpretation of policy and procedure. The Risk Management Agency

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It may
be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

(RMA), a division of the USDA, did not specifically answer Lackey's request for a policy interpretation. Instead it (timely) responded saying his request did not present a matter about which it could offer guidance—essentially, it lacked authority or responsibility to make a policy or procedure determination regarding his specific factual situation. Lackey availed himself of the intra-agency appeal process. The matter was presented to an agency hearing examiner who decided the RMA erroneously declined to offer policy guidance. Upon Lackey's further appeal the USDA ultimately required the RMA to provide the requested guidance (which it timely did on remand). However, the USDA also concluded the RMA's response to Lackey (saying his request was beyond its ken), while erroneous, was a "response" within the meaning of the statute and its implementing regulations. Therefore, it concluded, sanctions were not appropriate. Claiming the USDA's conclusion incorrectly applied the pertinent regulations Lackey sought judicial review under the Administrative Procedures Act (APA). He argued the regulations offered the RMA only a binary choice (seek clarification of the request or issue a FAD) and since it's "response" to his inquiry was neither he is entitled to sanctions. In affirming the agency decision, the district court considered Lackey's "neither fish nor fowl" argument, but decided USDA's interpretation of its regulations was entitled to deference and, affording deference, its decision was neither incorrect nor unreasonable. We agree.

## I.　　BACKGROUND

A.　　USDA Regulations

The 1938 Federal Crop Insurance Act ("Act" or "FCIA"), 7 U.S.C. § 1501-24, is designed to "promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." *Id.* § 1502(a).  Congress created the Federal Crop Insurance Corporation ("FCIC" or "Corporation"), a government-owned corporation which acts as an "agency of and within the Department [of Agriculture]" to administer the Act.  *Id.* § 1503.  Congress also created the Risk Management Agency ("RMA") to supervise the FCIC and administer all programs authorized under the FCIA.  7 U.S.C. § 6933(a), (b)(1)-(3); 7 C.F.R. § 400.701.  The RMA is headed by an Administrator appointed by the Secretary of Agriculture and who "also serve[s] as Manager of the Federal Crop Insurance Corporation."  7 U.S.C. § 6933(c).  Thus, the RMA speaks for the USDA on matters relating to the FCIC.

The Act empowers the FCIC to provide crop insurance directly to farmers or provide reinsurance "to the maximum extent practicable" to private entities providing such insurance.  *Id.* § 1508(a)(1) & (k).  It requires the FCIC to establish procedures for responding to specified types of inquiries from farmers and imposes a sanction if the response is not timely:

- 3 -

(1) Procedures required

The Corporation shall establish procedures under which the Corporation will provide a final agency determination in response to an inquiry regarding the interpretation by the Corporation of this subchapter or any regulation issued under this subchapter.

(2) Implementation

[T]he Corporation shall issue regulations to implement this subsection.  At a minimum, the regulations shall establish--

      (A) the manner in which inquiries described in paragraph (1) are required to be submitted to the Corporation; and

      (B) a reasonable maximum number of days within which the Corporation will respond to all inquiries.

(3) Effect of failure to timely respond

If the Corporation fails to respond to an inquiry in accordance with the procedures established pursuant to this subsection, the person requesting the interpretation of this subchapter or regulation may assume the interpretation is correct for the applicable reinsurance year.

7 U.S.C. § 1506(r).

      FDIC implemented § 1506(r) by regulation found at 7 C.F.R. § 400.768.  It

provides:

      (a) FCIC will not interpret any specific factual situation or case, such as actions of any participant under the terms of a policy or any reinsurance agreement.

      (b) If, in the sole judgment of FCIC, the request is unclear, ambiguous, or incomplete, FCIC will not provide an interpretation, but will notify the requester that the request is unclear, ambiguous or incomplete, within 30 days of such request.

(c) FCIC will provide a final determination of the interpretation to a request that meets all the conditions stated herein[1] to the requester in writing, and at FCIC's discretion in the format in which it was received, within 90 days of the date of receipt by FCIC.

(d) If a requestor is notified that a request is unclear, ambiguous or incomplete under section 400.768(b), the time to respond will be tolled from the date FCIC notifies the requestor until the date that FCIC receives a clear, complete, and unambiguous request.

(e) If a response is not provided within 90 days, the requestor may assume the interpretation provided is correct for the applicable crop year.

(f) All agency final determinations will be published by FCIC as specially numbered documents on the RMA Internet website.

---

[1]     The requestor obligations are listed in 7 C.F.R. § 400.767 as follows:

(a) All requests for a final agency determination under this subpart must:

> (1) Be submitted: [listing the specific addresses for letter, facsimile, or electronic mail]
>
> (2) State that it is being submitted under section 506(s) of the Act;
>
> (3) Identify and quote the specific provision in the Act or regulations for which a final agency determination is requested;
>
> (4) State the crop year for which the interpretation is sought;
>
> (5) State the name, address, and telephone number of a contact person affiliated with the request; and
>
> (6) Contain the requester's detailed interpretation of the regulation.

(b) The requestor must advise FCIC if the request for a final agency determination will be used in a lawsuit or the settlement of a claim.

(c) Each request for final agency determination under this subpart must contain no more than one request for an agency interpretation.

(g) All final agency determinations are considered matters of general applicability that are not appealable to the National Appeals Division.[2] Before obtaining judicial review of any final agency determination, the person must obtain an administratively final determination from the Director of the National Appeals division on the issue of whether the final agency determination is a matter of general applicability.

At issue here is the agency's interpretation of the term "response" in subsection (e).

## II.        **FACTUAL AND PROCEDURAL HISTORY**

Lackey is a cotton farmer in Lea County, New Mexico. He purchased multi-peril crop insurance for his 2005 cotton crop from a private provider reinsured by the FCIC. On June 7, 2005, Lackey presented his insurer with a claim for disease and hail damage to his cotton crop. The insurance adjustor adjusted for the hail damage, but would not adjust for disease loss until the crop reached maturity when actual losses could be determined. The response was a sore spot with Lackey who did not want to bring a diseased crop to harvest or wait to collect insurance monies. He thought the crop should be adjusted based upon an agricultural expert's report he provided to the insurance company. It said his cotton crop was diseased.[3] Notably the report was based on a small

---

[2]       "The National Appeals Division [NAD] reports directly to the Secretary of Agriculture and is independent of other parts of USDA. Its sole mission is to provide fair and timely hearings and appeals to USDA program participants." http://www.nad.usda.gov

[3]       Lackey's report came from the New Mexico State University Plant Diagnostic Clinic. (Appx. Vol. II at 479-82.) Its diagnosis was apparently based on six plant samples Lackey submitted from his 2005 crop. The report identified the presence of "vercillium wilt" which is "a serious disease on cotton, especially in the Southwestern U.S. The disease is reported to cause loss of up to 75% in heavily infected crops." (*Id.*

sampling of his 2005 crop (six samples), did not analyze the degree of infestation and did

not estimate the extent of expected loss. **[Appx. Vol. I at 19-20, Vol. II at 481.]**

On July 10, 2005, Lackey sent a written request to RMA entitled "Request for

Determination of Failure to Comply with Policies and Procedures of Federal Crop

Insurance Handbook." (Appx. Vol. I at 19.) Lackey's letter described his encounters

with the insurance adjustors:

> I was systematically informed by [several insurance representatives] that
> the Loss Adjustment Standards manual makes no provisions for disease
> adjustment and that all green plants would be taken to harvest in their
> entirety or to harvest in designated strips. [The insurance adjustor] . . .
> proceeded to pull up green leafed cotton plants he did not consider "viable".
> I refused his adjustment on the basis that he could not differentiate diseased
> versus non-diseased plants visually. I requested a more qualified
> adjuster . . . .

(*Id.* at 20.) A second adjustor was sent to view the crop who again began to pull up

plants. When Lackey objected, he was told "the only way they would adjust for disease

was at harvest in the form of lost production." (*Id.*) Referring to the definition of "live

plant" found on page 16 of the Loss Adjustment Standards handbook, Lackey's letter

continued:

> Correctly interpreting the meaning of live plant with substantiated
> laboratory results by an Agricultural Expert should allow adjustment for
> diseased plants. When there is Agricultural Expert evidence of disease
> throughout a unit, with or without a quantifiable amount, deference should
> be given to the expert opinion and therefore to the insured . . . . Their
> position is that no one, not even experts, can accurately predict yield of

at 479.) The report also identified a fungus commonly known as "wet weather blight"
which "is rarely serious, but occasional serious losses have been reported." (*Id.* at 481.)
It further explained techniques to mitigate damage from the diseases. The report did not
say his crop was heavily infected.

- 7 -

diseased plants, therefore they want to go to harvest for accurate yields. Ironically, I too believe that no one, not even experts, can accurately predict yield of diseased plants, therefore, since I have proof of diseased plants . . . I should not have my risk increased by additional farming costs [or] forced to take a chance of any unit with compromised plants.

(*Id.* at 20-21.) He closed with the following request: "Please define policy and procedure in this matter." (*Id.* at 21.)

On September 30, 2005, the RMA Deputy Administrator for Compliance wrote to Lackey referring to a telephone conversation between them on July 25, 2005. In his letter, he explained Lackey's request dealt with a dispute between Lackey and his insurer and that RMA "does not normally get involved in such disputes." (*Id.* at 192.) *See* 7 C.F.R. § 400.768(a). "FCIC will not interpret any specific factual situation or case, such as actions of any participant under the terms of a policy or an reinsurance agreement." The Deputy Administrator continued: "However, RMA is frequently asked to provide policy or procedure interpretations. There is a mechanism for requesting such interpretations contained at 7 C.F.R. part 400, subpart X or 7 C.F.R. subpart K." (*Id.*) He closed with the following statement: "If you think there is an issue regarding the interpretation of policy or procedure, you can request such interpretation from RMA." (*Id.* at 193.)

On October 5, 2005, Lackey e-mailed the RMA stating:

Please be advised that I continue to request a final agency determination on this matter. In accordance with my Multi Peril Crop Insurance Policy, "if the dispute in any way involves a policy or procedure interpretation . . . either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X" . . . . Furthermore, in accordance with 7 CFR Subpart X 400.768(c), please note the 90 day time frame ends

October 18, 2005. The following is my original request as submitted previously. Please advise if there are errors, omissions or any other information needed to complete this matter timely.

(*Id.* at 16.) The RMA denied his request for a final agency determination on October 17, stating in relevant part:

Neither your letter of July 10 nor e-mail message of October 5 qualifies as a request for a final agency determination (FAD) under the regulations published at 7 C.F.R., Part 400, Subpart X. A FAD can only provide an interpretation of provisions of the Federal Crop Insurance Act . . . or regulations issued under the authority of the Act. Since your request involves a dispute over whether the loss adjustor properly identified "live" plants, and not an interpretation of the Act or regulations issued there under, your request does not qualify for a FAD.

Your July 10 letter cites specific disagreements with your insurance provider concerning the determinations made during the stand reduction appraisal of your cotton. Specifically, you appear to question if the insurance provider could accurately determine the "live" plants that ultimately contribute to the lint. You are not questioning the meaning of the procedure. Therefore, your request also does not qualify for an interpretation of procedures by RMA under the provisions of section 20 of your policy.

(*Id.* at 4.)[4]

Lackey appealed from the RMA's determination to the USDA's National Appeals Division (NAD). Upon due consideration the hearing officer concluded in relevant part:

---

[4] A FAD is required within 90 days if "a request . . . meets all the conditions" enumerated in 7 C.F.R. § 400.767, reproduced *infra* at FN1. Lackey's July request clearly did not meet all the regulatory requirements. It did not mention its purpose was to request a final agency determination, it did not state it was being submitted under § 506(s) of the Act, and it did not identify and quote a specific provision in the regulation. We do not base our decision here on Lackey's failure to comply with these requirements. Rather, we note the failings of his request only as it assists our interpretation of the regulatory language. The hearing officer concluded the request "admittedly" was "unclear" and the RMA should have notified Lackey of that fact. (Appx. Vol. I at 64.)

On July 10, 2005, appellant sent a letter to RMA requesting a FAD. Appellant claimed that a provision in the Adjustment Standards means that a separate adjustment could be made for plants killed by disease. *RMA did not respond. Appellant sent an e-mail to RMA on October 5, 2005, again requesting a FAD. By letter of October 17, 2005, RMA finally responded to Appellant*, stating that neither Appellant's letter nor e-mail qualified as a proper request for a FAD.

(*Id.* at 62 (emphasis added.)) The hearing officer held that because Lackey's October 5 e-mail referenced his insurance policy provisions which were "set out in [their] entirety in Section 457.8" of the FCIC regulations, the insurance policy provisions were properly subject to a request for a final agency determination. (*Id.* at 64.) The insurance policy provisions/FCIC regulations require a final agency determination stating "whether a specific policy or procedure is applicable to the situation, how it is applicable, or the meaning of any policy or procedure . . ." which then becomes binding on the parties in subsequent dispute resolution procedures. (*Id.*) Therefore, the RMA erred in characterizing the request as a factual dispute and in failing to notify Lackey that his request was "unclear, ambiguous, or incomplete." (*Id.* at 65.)

Lackey requested the Director of NAD to review the hearing officer's determination. Specifically he wanted a decision making clear that, because the RMA did not notify him that his request was unclear, ambiguous or incomplete within 30 days[5] or issue a final agency determination within the 90 days allowed by regulation, § 400.768(e), he was entitled to the regulatory sanction—he could assume his

---

[5] Lackey does not claim the failure to timely notify him that he must amend his request would, by itself, trigger the statutory sanctions. He maintains that, in the absence of such notice, the RMA must issue a FAD within 90 days.

interpretation of policy (that he should not be required to bring his crop to harvest before it could be adjusted for loss) was correct for the 2005 crop year.  He also requested the Director to grant equitable relief for the maximum policy amount, $167,154, pursuant to 7 C.F.R. § 11.9(e).  **[*Id.* at 108.]**

The NAD Director issued a decision affirming the hearing officer's findings and conclusions *except* its conclusion that the RMA did not timely respond to Lackey's request for a FAD.  The Director stated the "RMA met its obligation to respond to [Lackey's] FAD requests with its letter dated September 30, 2005 and the October 17, 2005 adverse decision."[6]  (*Id.* at 152.)  Thus:

> The Hearing Officer's determination that RMA's response was erroneous, because it misinterpreted Appellant's request, means that RMA is now obliged to issue a new response to Appellant's request for a FAD.  The 90-day period for RMA to respond to a request begins from the date it receives a clear, complete, and unambiguous request.  I reiterate that RMA has indicated that it is in the process of issuing a FAD in accordance with the Hearing Officer's Appeal Determination.  If that new response is adverse to Appellant, he may appeal it pursuant to the applicable regulations.

(*Id.*)  The decision also concluded because the crop insurance program was not a "covered" program under 7 U.S.C. § 7996(a)(2)(B), NAD lacked jurisdiction to grant

---

[6]  "The Director may delegate his or her authority to conduct a review under this paragraph to any subordinate official of the Division other than a Hearing Officer.  In any case in which such review is conducted by such a subordinate official, the subordinate official's determination shall be considered to be the determination of the Director and shall be final and not [administratively] appealable."  7 C.F.R. § 11.6(a)(3).  Accordingly, we refer to "the Director" whether the decision was issued by the Director or an appropriate subordinate.

equitable relief.[7]  (*Id.*)  Lackey then filed a request for reconsideration.  The Director denied the request, stating:  "That the RMA response was erroneous does not render it nonexistent.  However, since it was erroneous, you are entitled to a new response . . . ." (*Id.* at 162.)  The decision further stated:  "This is a final determination of the National Appeals Division, for which judicial review is available pursuant to 7 U.S.C. § 6999."[8] (*Id.* at 163.)

Lackey sought judicial review of NAD's interpretation of the required "response." The district judge referred the matter to a magistrate judge who issued a report recommending the USDA's interpretation of its regulations be affirmed.  Lackey objected, claiming the clear language of the regulation required the RMA to respond in one of two ways:  either it must issue a FAD within 90 days or it must provide notice (within 30 days) that the request needs to be clarified.  He claimed a failure to timely do one or the other triggers the sanction he seeks (accepting his interpretation of FDIC policy).  Lackey pointed to the regulation's enabling statute, which provides "[t]he Corporation shall establish procedures under which the Corporation *will provide a final agency determination in response* to an inquiry regarding the interpretation by the Corporation of this subchapter or any regulation issued under this subchapter."  7 U.S.C. § 1506(r)(1) (emphasis added).  According to Lackey, this sentence plainly demonstrates

---

[7]     Lackey does not challenge the USDA's jurisdictional decision.

[8]     "A final determination of the Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5."  7 U.S.C. § 6999.

Congressional intent to define a "response" as a "final agency determination." Because the agency's determination of its regulation is inconsistent with the enabling statute, he maintained it is not entitled to any deference.[9] The district judge rejected Lackey's objections and adopted the magistrate's recommendation, concluding RMA's September and October letters amounted to a timely "response to an inquiry," thus sanctions were inappropriate. **[Appx. Vol. II, tabs 3, 4 & 5.]**

### III.    **DISCUSSION**

Our standard of review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which governs judicial review of agency actions, is well-known.

> [W]e review the lower court's decision de novo . . . [and] set aside the agency's action . . . if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' We will also set aside an agency action if the agency has failed to follow required procedures . . . . The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. Furthermore, [i]n reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action.

*Citizen's Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quotations and citations omitted). "We give great deference to [an agency's]

---

[9]     His claim that the regulation or the USDA's interpretation is contrary to legislative intent was raised for the first time in his objection to the Magistrate Judge's recommendations, which did not mention the issue. In ruling on his objections the district court did not address the legislative argument. Nor will we as it came too late. "In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir.1996)." *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001).

- 13 -

interpretation of its own regulations, and we will only reject those interpretations when they are unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *Utah Envtl. Cong. v. Richmond,* 483 F.3d 1127, 1134 (10th Cir. 2007) (quotations omitted). "Thus, the ultimate standard of review is a narrow one [and we are] not empowered to substitute [our] judgment for that of the agency." *Id.* (quotations omitted).

Lackey contends (as he always has) 7 C.F.R. § 400.768, read in its entirety, can be construed only one way—the agency must either respond that his request was unclear, incomplete or ambiguous within 30 days of his request or it must issue a final agency determination within 90 days of his request.[10] As he reasons, since the RMA did not notify him that his request was wanting, it was required to issue a FAD within 90 days and its letter rejecting his request was obviously not a FAD. *Ergo*, there was no timely response and he is entitled to the sanction dictated in 7 U.S.C. § 1506(r) and § 400.768(e)—he may assume his interpretation is correct for the crop year. We are not persuaded.

---

[10] He claims the agency's interpretation rendered the enforceability provision meaningless, is inconsistent with the clear and specific terms of the regulation, is internally inconsistent and is contrary to legislative intent. We reject the former arguments and do not reach the last one. *See* FN9, *supra*. In any event, the best measure of legislative intent is the words of the statute. Here those words are not ambiguous, "If the Corporation fails to respond to an inquiry in accordance with the procedures established pursuant to this section, the person [is entitled to sanctions]." 7 U.S.C. § 1506(r) (emphasis added).

His reading fails to account for the language of 7 C.F.R. § 400.768(a), quoted *infra* page 4, which precludes FCIC from interpreting specific factual situations or cases. That is a threshold determination. If the requested interpretation is not one permitted by the regulations the procedural requirements that follow, including time lines, matter not. Here the RMA concluded Lackey's request for a policy or procedural interpretation was not, to borrow a phrase, justiciable in that forum. It erred, according to the hearing officer and the NAD. But that does not make the RMA's decision a nullity, entitling Lackey to a retroactive sanction. It simply means, as the NAD and the District Court determined, the RMA must, on remand, timely respond to his request by either deciding to seek clarification or issue a FAD. The time to do so necessarily runs from the date of a remand to the RMA, which came only after Lackey fully exhausted his agency appeal rights. When it finally came the RMA timely issued a FAD.[11] We see no ambiguity in the regulations; the FCIC cannot issue a FAD if the request for an interpretation is not within its cognizance regardless of how clear, unambiguous or complete the request may be. In any event Lackey was timely notified of RMA's determination. To the extent a response was required its response was sufficient.[12]

Lackey claims that unless a "response," as he defines it, is required the USDA's interpretation allows the RMA to "simply communicate in any arbitrary form or fashion

---

[11] The FAD was issued on September 21, 2006. *See* http://www.rma.usda.gov/fcic: FAD-059. Lackey did not appeal from the FAD.

[12] Lackey's first letter was dated July 10, 2005. On July 25, 2005 the RMA Deputy Administrator for Compliance spoke with him about it by phone, explaining RMA's position that it did not have authority to address his request.

with the requestor, and, in the event that RMA fails to issue a timely FAD, the requestor would be left without recourse." (Appellant's Br. at 16-17.) Hyperbole!

The September 30, 2005 letter clearly notified Lackey that the RMA did not perceive he was requesting a FAD. Indeed, the RMA's response directed him to the procedures to do so if, in fact, that is what he wanted. Accordingly, the RMA rejected a request to intercede in what it considered to be a factual dispute, beyond its authority to resolve. Under these circumstances neither the statute nor the regulations mandate the specific "response" Lackey demands.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The common definition of "response" is "1: an act of responding 2: something constituting a reply or reaction." Merriam-Webster's Collegiate Dictionary (11th Ed. 2006). Contrary to Lackey's assertions, the NAD did not hold that *any* communication from RMA would qualify as a response. It held the September 30, 2005 letter and the October 17, 2005 adverse decision qualified as responses. These communications directly addressed the substance of Lackey's claims as understood by the RMA. There is no indication the RMA was being disingenuous in its interpretation of Lackey's request. The Director of the NAD was correct: "[t]hat the RMA response was erroneous does not render it nonexistent."[13] (Appx. Vol. I at 162.)

---

[13] In his reply brief, Lackey argues we should take judicial notice that the RMA has issued a public statement (last modified on January 1, 2006) which interprets "the regulation at issue in a manner supporting Lackey's interpretation." (Reply Br. at 1.) He

- 16 -

Lackey's claim that the interpretation leaves him without remedy is without merit. Lackey appealed from the October 17, 2005 adverse determination (received within 90 days of his inquiry) and at the end of the day received a favorable decision—the RMA originally erred and should have issued a final agency determination. He ultimately received the requested FAD, albeit after considerable effort and delay resulting from unusual circumstances.

While Lackey's interpretation of the regulation is not patently unreasonable, the agency's interpretation is equally, if not more, reasonable. It provides the RMA the ability to craft a response it deems most appropriate to each discrete inquiry. The fact that, in this instance, its perception was incorrect does not lead to a conclusion that it must now be sanctioned. Lackey failed to demonstrate the final decision of the USDA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

argues the public statement negates the deference we owe the USDA in this matter. The "public statement" Lackey refers to is merely a reiteration of the language in 7 C.F.R. § 400.768 and sheds no light on the regulatory interpretation at issue here.